AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Erika L. Csicsila, (312) 353-5370

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

Case Number: **20 M84**

the US Express Mail package bearing tracking number ▮▮▮▮▮▮▮, further described in Attachment A

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Thomas Lynch, a Postal Inspector of the U.S. Postal Inspection Service, request a search warrant and state under penalty of perjury that I have reason to believe that in the following package:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, fruits, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1956(h) | narcotics conspiracy and money laundering conspiracy |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

THOMAS LYNCH, Postal Inspector
U.S. Postal Inspection Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 31, 2020

_____
*Judge's signature*

City and State: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )
              )
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Thomas Lynch, being duly sworn, state as follows:

1. I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS). I have been so employed since approximately September 2017. Prior to becoming employed with the USPIS, I was a Special Agent with the U.S. Postal Service (USPS) Office of Inspector General (OIG) for approximately one year and six months. Prior to my employment with USPS-OIG, I was a Special Agent with the U.S. Secret Service for approximately 7 years. As part of my duties as a USPIS Postal Inspector, I investigate criminal violations relating to violations of the federal laws relating to the mails and to controlled substances. I have also participated in numerous investigations involving the distribution of narcotics through the internet, including the so called, "dark web." I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use to conceal and launder the proceeds of their illicit drug trafficking enterprises. As part of my work on narcotics investigations, I have obtained and participated in the execution of multiple federal search warrants. These warrants have involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (locations used to store drugs, money, or related items), storage facilities, bank safe deposit boxes, cellular phones, and

computers. Evidence recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

2.     I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have participated in numerous drug-trafficking and money-laundering investigations involving various investigative techniques, including physical and electronic surveillance, the use of cooperating witnesses and informants, video and visual surveillance, questioning of witnesses, controlled purchases and deliveries of narcotics, obtaining and analyzing a wide variety of records and data (including pen register and trap and trace data and cell phone location data), and tracing drug proceeds. I have also been involved in the execution of numerous search warrants, arrests, and consent searches related to violations of federal law. These investigative actions have covered the searches of locations such as vehicles, residences, and businesses. Evidence recovered in these searches has included multi-kilogram quantities of cocaine, heroin, and marijuana, drug ledgers, large quantities of United States currency, drug packaging and paraphernalia, and other evidence. I have participated in the debriefing and questioning of numerous defendants, witnesses, informants, and others who have

2

knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking.

3. As part of my duties as a USPIS Postal Inspector, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

4. I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

5. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records

3

pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants..

6.     This affidavit is made in support of an application for a warrant to search the US Express Mail Parcel with Tracking Number ████████████ described further in Attachment A (the "**Subject Parcel**"), for evidence, instrumentalities, fruits, and contraband described further in Attachment B, concerning narcotics conspiracy and money laundering conspiracy offenses, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1956(h) (the **Subject Offenses**).

7.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of violations of the **Subject Offenses**, are located within the Subject Parcel.

I.     **FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PARCEL**

8.     The DEA, USPIS, and IRS are currently investigating several individuals—including Spouse 1 and Spouse 2—believed to be participating in a

money laundering conspiracy, based out of Chicago, ███████████ and ██████████.
Spouse 1 (who resides in ████████) and Spouse 2 (who resides in ██████████ are
married (respectively) to Defendant 1 and Defendant 2, relatives who are both
serving prison sentences for operating a large narcotics conspiracy that involved
multiple tons of cocaine and many millions of dollars of narcotics proceeds.[1] Spouse 1
and Spouse 2 and their associates are believed to be covertly transferring narcotics
proceeds via U.S. mail from Chicago and ████████ to themselves. Relative 1—who is a
relative of Defendant 1 and Defendant 2—is believed to be storing some of these
narcotics proceeds in the area of ████████████ and regularly mailing portions of the
proceeds to Spouse 2. On one prior occasion within the last approximately four
months, investigators executed search warrants on a parcel sent by Relative 2 via
USPS Priority Mail Express to Spouse 1 in ████████ and found a large sum of cash.
Relative 2 sent another such parcel, this time to Spouse 1 in ██████████████ on or
about January 27, 2020, (the **Subject Parcel**), which is believed to contain narcotics
proceeds.

---

[1] Defendant 1 and Defendant 2 are cooperating with the government. However, they have
not been questioned about the 2018-2020 activity described in this Affidavit.

*Witness 1 Informs Law Enforcement that Spouse 2 Has Purchased Expensive Travel with Bulk Cash*

9.     On or about May 10, 2018, investigators received information from a witness ("Witness 1") relating to travel purchased in cash by Spouse 2.[2] According to Witness 1, Spouse 2 frequently uses a travel agent in ████████████ to book lavish vacations to locations such as Turks and Caicos, Dubai, Las Vegas (for a Jennifer Lopez concert), and different countries in Europe. Spouse 2 spends approximately $20,000 to $30,000 in cash per trip, which includes airfare and hotel accommodations for groups of people.

10.     According to Witness 1, after Spouse 2 arranged for these trips, a male, identified as Relative 1, traveled in a large white pick-up truck and delivered the cash payments to the travel agency. Witness 1 provided investigators Relative 1's name, which I know—based on communications with fellow investigators who participated in the investigation of Defendant 1 and Defendant 2—to be the brother of Defendant 1 and Defendant 2. Relative 1 resides in ██████████████, which is near ██████

11.     According to Witness 1, the cash that Relative 1 delivered was "rolled up funny," wrapped up in rubber bands, and "smelled funny." Based on my training and experience, I know that narcotics proceeds are often stored in rolls, wrapped in

---

[2] Witness 1 is a lay witness who has first-hand knowledge about the activity at the referenced travel agency. Information provided by Witness 1 has proven reliable, including by being corroborated by the border-crossing encounters detailed below.

rubber bands, and have the odor of narcotics. I believe that the cash Relative 1 delivered consisted of narcotics proceeds.

12.     On or about July 12, 2018, investigators received additional information from Witness 1. Witness 1 relayed that Spouse 2 had recently traveled to Turks and Caicos, which trip cost approximately $30,000. Approximately twelve individuals accompanied Spouse 2 on this trip. Witness 1 stated that Relative 1 made the payment at the travel agency and that the payment was made all in cash.

### Spouse 1 and Spouse 2 Were Stopped at the Border with Evidence of Bulk Cash/Money Laundering

13.     On or about July 4, 2019, officers with U.S. Customs and Border Protection at O'Hare Airport in Chicago had contact with Spouse 1 and Spouse 2 as they arrived in the U.S. on a flight from Greece. Officers conducted a border inspection of Spouse 1's and Spouse 2's personal belongings and cellular telephones. Officers observed that both individuals had travel documents from " ███████ Travel" relating to the trip to Europe—i.e., the same travel agency about which Witness 1 provided investigators information.[3]

14.     Approximately one year earlier, on or about July 19, 2018, officials with Customs and Border Protection and Homeland Security Investigations had contact with Spouse 1 and Spouse 2 pursuant to border authority after the two arrived at

---

[3] Investigators contacted Witness 1 about this trip, and Witness 1 informed investigators that the trip had been for ten to 12 people to travel to Rome and Greece, and that the trip had been paid for in cash.

JFK Airport in New York from Turks and Caicos. Spouse 2 was in possession of five cellular telephones, including two bearing Chicago area code (312). Spouse 1 was in possession of a piece of notepad paper that had the following handwritten notes:



15.     Based on my training and experience, and the training and experience of my fellow law enforcement officers, I believe that this paper is a ledger that contained Spouse 1's notes keeping track of the number of packages/amount of narcotics proceeds that Spouse 1 had consumed in the time period indicated.

16.     In addition, Spouse 1's cellular telephone contained a photograph of a Discover credit card in the name of Individual A who, based on my conversations with fellow investigators involved in the prior investigation, I know to have been a member of Defendant 1 and Defendant 2's criminal enterprise. Individual A previously admitted transporting bulk currency to Chicago for the enterprise after Defendant 1 and Defendant 2 were in custody.

### Dozens of U.S. Mail Parcels Have Been Sent to Spouse 1 and Spouse 2 Over the Last Approximately 26 Months

17.     According to U.S.P.S. records, between approximately October 2017 and the present, approximately 95 packages were sent from the ████████ , area (including ████████ to two mailing addresses in ████████ that are associated with Spouse 2. Based on my training and experience and the investigation to date, I believe these packages were sent by Relative 1. Approximately 32 of these packages were sent to Spouse 2's home address. The remainder of the packages were sent to a CMRA in which a family member of Defendant 2 has a post office box.[4] In addition,

---

[4] On or about October 11, 2019, investigators obtained and executed a search warrant on a parcel addressed to the same CMRA location where Spouse 2 was previously observed retrieving the September Parcel. This parcel was mailed from a post office in ████████ ████ , via Priority Mail—not Priority Mail Express like the parcels found to contain cash (or

according to USPS records, between approximately October 2017 and the present, about 59 packages were sent from the Chicago area—including by Relative 2—to Spouse 1's home address in ████. According to USPS records, there have been approximately 5 Priority Mail Express parcels sent from the Chicago area to the destination address on the **Subject Parcel** since October 2019.

18.     All of the parcels referred to in the above paragraph were sent Priority Mail Express. Based on training and experience, I know drug traffickers frequently use Priority Mail Express overnight shipping to ship narcotics and/or their proceeds to limit the amount of time the contraband is in the mail stream and susceptible to inspection by law enforcement.

### *Relative 2 Sends Two Parcels to Spouse 1*

21.     On September 18, 2019, law enforcement traveled to the Elsdon Post Office, located at 4922 S. Kedzie Avenue in Chicago, to review security footage of two parcels mailed to Spouse 1's home address in ████. One parcel was mailed on or

---

the parcel described immediately below). Inside the parcel, investigators found several pieces of mail addressed to Spouse 2 and no evidence or fruits of the **Subject Offenses**.

On or about October 15, 2019, investigators obtained and executed a search warrant on a parcel addressed to Spouse 1 that was sent by a relative in the Chicago area via Priority Mail Express. Inside the parcel, investigators found another envelope that was sealed with tape at its seams and that had handwriting over the tape. Based on my training and experience, it appeared this tape was in place in order to detect whether the envelope had been opened or tampered with. Investigators did not open the inner envelope, but it was X-rayed and found to contain shapes consistent with cash. The parcel was then returned to the delivery stream.

about September 10, 2019 ("September 10 Parcel") and one parcel was mailed on or about September 11, 2019 ("September 11 Parcel").

22.    During a review of the footage, law enforcement observed a short, heavier-set Hispanic female with short black hair (Relative 2) mailing both parcels. Relative 2 paid for both parcels in cash.

***Relative 2 Sends $5,000 in U.S. Currency and a $500 Visa Gift Card to Spouse 1's residence.***

23.    On September 26, 2019, investigators learned that a parcel had been shipped from Chicago ▉ to Spouse 1 by name at her home address in ▉ ("September 26 Parcel"). That same day, a USPIS Postal Inspector inspected the September 26 Parcel at USPS ▉ Processing and Distribution Center, located at ▉.[5] The September 26 Parcel was mailed on September 25, 2019, from Chicago ▉, and was addressed to Spouse 1 at her home address in ▉, with a return address in Chicago ▉.

24.    On September 27, 2019, following the alert of a narcotics-detection dog, law enforcement sought and obtained a federal warrant from the Northern District of Illinois, which was executed on the September 26 Parcel. Inside, inspectors found approximately $5,000 in US Currency and a $500 Visa Vanilla Gift card. Attached to the gift card was a receipt for the gift card from a Walgreens Store located on the

---

[5] The parcel was returned to, and arrived in, the Northern District of Illinois on September 27, 2019, at law enforcement's direction.

11

4300 block of South Archer Avenue in Chicago. The receipt indicated the gift card was paid for in cash on September 18, 2019 at 5:44 p.m. Investigators subsequently released the parcel with the money and allowed it to continue to its final destination in furtherance of the investigation. According to USPS databases, the parcel was delivered on September 28, 2019.

25.     On September 30, 2019, law enforcement traveled to the Walgreens and met with employees to review security footage for the purchase of the gift card found in Subject Parcel 4. During the review of the footage, law enforcement observed the same unknown female Hispanic purchasing the gift card who was observed mailing the September 10 Parcel and the September 11 Parcel (Relative 2).

26.     That same day, law enforcement traveled to the Elsdon Post Office and reviewed the security footage for the mailing of the September 26 Parcel, which contained $5,000 cash and a $500 gift card. During the review the law enforcement observed Relative 2 had sent the September 26 Parcel. Investigators then queried the driver's license photographs from the Illinois Secretary of State for a female who was listed with the Bureau of Prisons as a visitor of Defendant 1 (who is married to Spouse 1, to whom the September 10, 11 and 26 Parcels were sent). Upon viewing this female's driver's license photograph, investigators found her substantially similar in appearance to Relative 2 who mailed September 10, September 11, and September 26 Parcels to Spouse 1, which included the $5,000 cash and $500 gift card.

### *Relative 2 Sent a Parcel to Spouse 1 Believed to Contain Drug Proceeds*

27.     On the morning of October 15, 2019, law enforcement established surveillance on the residence of Relative 2.  During surveillance, law enforcement observed Relative 2 exit the alley way near Relative 2's detached garage. Law enforcement maintained constant surveillance of Relative 2's vehicle from the alley way directly to the Elsdon Post Office, where Relative 2 parked near the front entrance of the Post Office.

28.     Relative 2 then entered the Post Office via the main entrance doors.  An Inspector entered the Post Office via the rear entrance doors a short time later. Moments after Relative 2 exited the Post Office, the Inspector examined the outgoing mail container behind the retail counter.  Inside the container, resting on top of other parcels was the an Express Mail Parcel, which the Inspector seized for safekeeping (the "October Parcel").

29.     The October Parcel was addressed to Spouse 1 by name at her home address in ███, it had a return address of Spouse 1's mother's address in Chicago (60638), it had the tracking number ███, it was sent U.S. Priority Mail Express, it measured approximately 12.5" x 9.5", it weighed approximately 11.3 ounces, and the postage cost $25.50.

30.     On or about October 15, 2019, following a narcotics detection dog's alert to the October Parcel, Magistrate Judge Sheila Finnegan signed a warrant and entered an order authorizing the search of the October Parcel. Inside there was a

13

manila bubble mailer. The bubble mailer measured approximately 9.5" x 7" x 1" and it had the words, "PLEASE DO NOT BEND," written on each side in red marker. The glued flap on the back of the bubble mailer was taped down with what appeared to be a signature in black marker covering the flap and an additional signature bridging the tape and bubble mailer envelope. The piece of tape continued to the front of the bubble mailer with a signature bridging the tape and bubble mailer. The front of the bubble mailer had Spouse 1's mother's address in Chicago          in the return portion along with Spouse 1's address in the destination portion of the mailer.



31.     Based on my training and experience, and the training and experience of the Postal Inspectors participating in this investigation, I know that the use of

14

signatures on tape at the seams of an envelope is a method to detect tampering. Here, I believe that Relative 2 and Spouse 1 were previously made suspicious by the delay the September 26 Parcel (which contained $5,000 and a $500 gift card) experienced when law enforcement temporarily detained it in order to search it pursuant to a warrant. As such, I believe that Relative 2 and Spouse 1 took these anti-tampering steps in order to see whether law enforcement is searching their cash shipments.

32. Investigators took initial steps to covertly access the contents of the bubble mailer, but then ceased those attempts. Instead, the bubble mailer was X-rayed, and it appeared to contain several stacks of materials that are consistent in shape and size with stacks of cash. The bubble mailer was also bendable consistent with an envelope containing stacks of cash.

33. The bubble mailer was placed back into the Express Mail envelope and sealed. The Express Mail envelope was returned to the mailstream in the Express Mail unit at O'Hare.

***On January 27, 2020, a Narcotics Detection Dog Alerted to the Subject Parcel Sent by Relative 2 to Spouse 1***

34. According to USPS records, the **Subject Parcel** was mailed on January 27, 2020, from Chicago, Illinois, to a business address located in ███████████ that, according to a law enforcement database, is associated with Spouse 1. In addition, the mailing label on the **Subject Parcel** lists Spouse 1 by name after "c/o." The **Subject Parcel** lists the same sender name, sender address, and same recipient

15

(though at a different ███████ address), as the September 10 Parcel, September 11 Parcel, September 26 Parcel, in which law enforcement located $5,000 in cash and a $500 gift card, and the October 15 Parcel. All four parcels were sent via USPS Priority Mail Express.

35.     According to USPS records, the **Subject Parcel** was paid for in cash. As a Postal Inspector, I am aware that individuals who seek to avoid being connected to narcotics and/or their proceeds will often pay for shipments in cash in an effort to conceal their identity from law enforcement.

36.     On January 28, 2020, a Postal Inspector inspected the **Subject Parcel** at the USPS ███████ Processing and Distribution Center, located at ███████ ███████████████████████ The Subject Parcel bears $26.35 in postage, measures approximately 12 ½ in. X 9 ½ in., and weighs approximately 5 ounces.

37.     On January 30, 2020, law enforcement traveled to the Elsdon Post Office, located at 4922 S. Kedzie Avenue in Chicago, to review security footage of the **Subject Parcel** being mailed to Spouse 1 in ███████. During a review of the footage, law enforcement observed Relative 2 mailing the **Subject Parcel**. Relative 2 paid for the shipping cost in cash.

38.     Also on January 30, 2020, after the Subject Parcel was returned to the Northern District of Illinois at law enforcement's direction, I arranged for Summit Police Department Sergeant and his canine partner, "Harley," to meet with me and examine the **Subject Parcel** at the DEA HIDTA Office in Chicago. According to the

Canine Sergeant, Harley is certified annually by the State of Illinois as a narcotics dog. Harley was most recently re-certified on April 15, 2019. Harley is trained to sniff buildings, vehicles, envelopes, and wrapped parcels to detect the odors of heroin, cocaine, marijuana, hash, methamphetamine, and other controlled substances that could be contained inside. Harley is also trained to indicate the presence of such substances and/or their scents by alerting to the item he is sniffing. In addition, according to USPIS records, Harley has successfully alerted to controlled substances in parcels on 20 occasions since March 2019 with a success rate of approximately 100%. To the best of my knowledge, Summit Police Department does not maintain records regarding the overall success rate for its drug detection dogs, and therefore only the USPIS success rate is available.

39.    I arranged a controlled substance detection test by placing the **Subject Parcel** among approximately 11 other parcels in the room. I then witnessed Harley examine the parcels and observed Harley alert by sitting next to the **Subject Parcel**. Harley did not alert to any of the other parcels. The Canine Sergeant informed me that Harley's actions indicated the presence of narcotics and/or controlled substances in the **Subject Parcel**. Based upon my training and experience, I know that narcotics proceeds often bear the scent of narcotics.

17

## II.    CONCLUSION

40.    Based on the above information, I respectfully submit that there is probable cause to believe that narcotics conspiracy and money laundering conspiracy offenses, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1956(h), have been committed, and that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Parcel**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Parcel** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.


Thomas Lynch
Postal Inspector
U.S. Postal Inspection Service

Subscribed and sworn
before me this 31st day of January, 2020

Honorable SUSAN E. COX
United States Magistrate Judge

18

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

A USPS Priority Mail Express Parcel with Tracking Number ███████████ bearing $26.35 in postage, measuring approximately 12 ½ in. x 9 ½ in., and weighing approximately 5.0 oz.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, fruits and contraband concerning violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1956(h), as follows:

1.     Controlled substances, and any associated packaging

2.     Drug proceeds, and associated packaging

3.     Any items reflecting the identity of the owners of any controlled substances and drug proceeds found in the package.